IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| AGALAR ALIEV | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No:_____ |
| | ) |
| | ) |
| MUNICIPAL EMPLOYEES CREDIT UNION | ) |
| OF BALTIMORE | ) |
| | ) |
| a/k/a MECU | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Agalar Aliev, ("Plaintiff"), by and through counsel, brings this Complaint against Municipal Employees Credit Union of Baltimore. ("MECU") on the grounds and in the amounts set forth herein:

### Preliminary Statement of Facts

1. Mr. Aliev is a sixty-year-old immigrant that does not speak English well and relies upon friends and acquaintances to assist him in communicating. One of the individuals that he trusted and relied upon was Heydar Allahverdiyev. Mr. Allahverdiyev is in his early thirties and looks nothing like Mr. Aliev. Despite the huge age discrepancy and the fact that Mr. Aliev had retained possession of his driver's license at all times relevant, Mr. Allahverdiyev was able to visit Autos Direct of Fredericksburg and convince it to sell him a $60,000 used truck in the name of Mr. Aliev. The limited evidence at this point reasonably suggests that the dealership (or at least one or more of its employees) was not fooled by this fraud attempt and knew that Mr. Allahverdiyev was not who he claimed to be and certainly not someone nearly twice his age. In order to test drive a vehicle at nearly all dealerships, the customer must provide a valid driver's license and the dealership

will copy it and hold onto it. Mr. Allahverdiyev had in his possession a photograph of Mr. Aliev's driver's license, he did not have the original document. The only copy of the driver's license in the dealership's records and deal file is a photograph of the license on a table. That photograph is taken from a distance and also reveals a bare foot exposed below the table on the floor. That photograph was not taken at the dealership. The inability of a consumer to produce an original driver's license (as opposed to just a photograph of one) would most likely have drawn or invited increased scrutiny. However, even very limited scrutiny would have revealed that this was a fraud in the making since Mr. Allahverdiyev was half Mr. Aliev's age, did not look like him, he used a different address and his signature was not even remotely close to the signature of Mr. Aliev as disclosed on his driver's license. The signatures on dozens of sales documents all looked alike and spelled out both Mr. Aliev's first and last name so that it easily could be read by anyone. However, those signatures looked nothing at all like Mr. Aliev's signatures as disclosed on the front and rear of his Virginia driver's license (as well as the photographic copy the dealership produced). Mr. Aliev's true signature has multiple loops, and it is impossible to make out even one letter, much less all the letters of his first and last name. Before any consumer can take delivery of a vehicle purchased on credit, they must produce proof of auto insurance. Mr. Aliev had insurance on his own vehicle, but not with Allstate. Mr. Allahverdiyev established a new policy with Allstate in Mr. Aliev's name to insure the vehicle. ADF had that application in its records (with the obvious fraudulent signature on the application) and provided a copy to counsel for the Plaintiff. In all likelihood, ADF provided MECU with that Allstate policy application as part of the transfer of the loan and deal file documentation. Mr. Aliev had never had a policy with Allstate, but because of

this fraud, a new policy was issued in his name to cover the truck. Not only was there personal insurance, but the dealership also sold a GAP policy that would cover the difference between the Allstate policy and the balance owed in the event of a total loss. Ironically, about six months after sale/purchase this truck was involved in a large collision and the vehicle was declared a total loss. That damage triggered claims against Allstate and the GAP policy. Both policies paid MECU based upon the fraud that was unknown to both of them at the time. MECU retained the fraudulent proceeds and based on information and belief has not refunded either insurance company. The combination of the two policies failed to pay off the outstanding debt and MECU ultimately charged off the balance remaining on the vehicle and the car loan and reported that to the CRAs. When Mr. Aliev learned of the damage to his credit, he sent out dispute letters to the three credit reporting agencies notifying them that this was a fraudulent car loan that had nothing to do with him. MECU and its fraud investigators were placed on notice to compare the true signatures with the fraudulent ones. The identification document that ADF provided to MECU as part of the reassignment of the loan was the photograph of a driver's license with a bare foot clearly visible in the photo. Even a cursory examination of the documents in its possession when notified of the identity theft would have placed MECU on notice that the proof of identity that was provided to the dealership (and subsequently MECU) was not a photocopy of an original, that the address on the driver's license did not match what was on the loan documents, and that the signature on the driver's license was not at all similar to the ones on the loan documents. Despite all those obvious red flags, MECU verified back to the CRAs that this account was not the result of identity theft and actually belonged to Mr. Aliev. Thus, not only did MECU unlawfully retain the proceeds from two insurance

policies obtained by fraud and forgery, but it continued to verify that Mr. Aliev was obligated on the outstanding balance due on a vehicle that he never received or operated. As a result, Plaintiff requests actual damages, statutory damages, punitive damages, attorney's fees, and costs for MECU's repeated violations of the Fair Credit Reporting Act at 15 U.S.C. §1681s-2b(b).

## Parties

2. Plaintiff Agalar Aliev is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because he is an individual. Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Agalar Aliev.

3. Municipal Employees Credit Union of Baltimore (MECU) is a furnisher of information as contemplated by FCRA section 1681s-2(a) & (b), that regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions or experiences with any consumer. MECU regularly conducts these business activities in the Eastern District of Virginia by credit reporting and providing retail credit financing to consumers in the Alexandria division of the Eastern District of Virginia.

## Jurisdiction & Venue

4. This court has jurisdiction pursuant to the Fair Credit Reporting Act 15 U.S.C. §1681 *et. seq.* and 28 U.S.C. §1331. Venue is proper in this jurisdiction and division as the Defendant is subject to personal jurisdiction in the Eastern District of Virginia by virtue of the business that MECU conducts within the division. MECU took assignment of a retail installment credit contract for the purchase of a car in the district and thereafter credit reported information inaccurately after having an opportunity to reinvestigate the accuracy of disputed information. MECU's actions caused damage to the Plaintiff in this

4

district and division.  Because the Defendant is subject to personal jurisdiction in the district and division, venue is proper in this Court.

## Factual Allegations

5. On or about October 25, 2021, Haydar Allahverdiyev went to Autos Direct of Fredericksburg, VA. ("ADF") and purportedly impersonated Agalar Aliev.

6. ADF purportedly sold Mr. Allahverdiyev a 2020 RAM 3500 truck in the name of Agalar Aliev for a sales price of $59,500.

7. ADF also prepared a RISC (loan contract) on the same date for $68,023.71 with Agalar Aliev identified as the Buyer/Obligor.

8. As part of the collective amount financed, ADF also sold a GAP policy in the name of Agalar Aliev with the beneficiary/insured listed as MECU of Baltimore.

9. Mr. Allahverdiyev purportedly applied for an auto insurance policy through Allstate Property & Casualty Insurance Co., (Allstate) to insure the Ram 3500.

10. All of the signatures on the loan documents and other contractual agreements between Mr. Allahverdiyev and ADF were forgeries and did not look like the signatures on his driver's license.  Even an untrained eye could clearly see that they were obvious forgeries.  Below is an example of the signatures from the purchase documents and below that is his driver's license with the signature provided.





11.   As is evident from the above document, Mr. Aliev signs his name with a series of loops and there is no way anyone can look at that signature and decipher any of the letters or make out the spelling of the name.

12.   As is evident from the GAP contract document in paragraph 10, the signature on that and the other similar contract and loan documents with ADF all spelled out the name Agalar Aliev and were easy to read and decipher as such.

13.   ADF provided delivery of the Ram 3500 to Mr. Allahverdiyev and not Mr. Aliev.

14.   Mr. Allahverdiyev failed to make all of the payments on the auto loan timely, and MECU reported to the credit bureaus that Mr. Aliev was late in making his loan payments, thereby damaging his reputation and his good credit standing.

15.   In the Spring of 2022, the Ram 3500 was involved in a collision that resulted in the vehicle being determined to be a total loss.

16.   Mr. Aliev had insurance on his own vehicle, but he never had insurance with Allstate. The fraudulently obtained policy in his name was not requested or obtained

6

by Mr. Aliev and also evidenced a forged signature that looked like the other documents in the MECU file and ADF file.

17. Allstate paid the fraudulent claim to MECU predicated upon the fraudulent application for insurance.

18. MECU collected the proceeds of the fraudulent insurance claim in or around June 2022 and based upon information and belief has failed to return the fraudulent insurance proceeds to Allstate.

19. In or around October 2022 the fraudulently obtained GAP insurance policy paid to MECU the proceeds of that policy based upon the total loss of the vehicle.

20. MECU has retained the proceeds of the GAP policy and failed to return and/or refund the proceeds of the fraudulently obtained policy.

21. MECU has retained for its own benefits the Allstate and GAP insurance policy payments despite the fact that they were obtained by fraud.

22. MECU proceeded to report to the Credit Reporting Agencies (CRAs) that this account was not only late, but ultimately charged off in May 2023 because even after the payment of the Allstate Policy and the GAP policy, there still remained an unpaid balance.

23. On or about August 1, 2023, Plaintiff issued credit dispute letters to the three major credit reporting agencies (Equifax, Experian, and TransUnion). The credit dispute packages disputed the accuracy of the information that MECU reported about the Plaintiff on his credit file.

24. The letter began by stating that Plaintiff was the victim of identity theft and asking that the identity theft related MECU account be removed from his credit file.

25. Plaintiff stated that his English was limited and that a friend had helped translate in order to initiate the credit dispute.

26. Plaintiff stated that someone that he trusted used his personal identifying information to open a car loan without his knowledge or permission.

27. Plaintiff stated that he had nothing to do with the car loan and that the signatures were obvious forgeries based on any comparison with his signature and the signature that was on the documents.

28. Plaintiff included with the dispute letters copies of his driver's license with his signature along with the copies of the retail installment sales contracts. Plaintiff also signed the credit dispute letter.

29. Plaintiff's letter noted that each of the signatures on the purchase documents spelled out each letter of the his name but that when Plaintiff signs his name, his signature is more compact such that the individual letters cannot be read.

30. The dispute letter noted that some payments were made on the loan, but many were late. In addition, the vehicle was declared a total loss and that a Gap policy made another significant payment on the loan, such that the final delinquent balance was $5,772.

31. Nothing related to the account should be credit reported by MECU on the Plaintiff's credit file because of the fraud and forgery.

32. Based upon the notice of the results of the reinvestigation from the credit reporting agencies, each credit reporting agency issued a notice of consumer dispute (ACDV) to MECU after receiving the credit dispute package dated August 1, 2023.

33. Based upon information and belief, each credit reporting agency would have attached a copy of the credit dispute letter along with the supporting documentation to any ACDV that the credit reporting agency issued.

34. MECU cannot dispute that it received an ACDV from Equifax in August 2023 regarding the Plaintiff and the account that is at issue in this action.

35. MECU cannot dispute that it received an ACDV from Experian in August 2023 regarding the Plaintiff and the account that is at issue in this action.

36. MECU cannot dispute that it received an ACDV from TransUnion in August 2023 regarding the Plaintiff and the account that is at issue in this action.

37. MECU cannot refute that the Plaintiff did not sign the underlying retail installment sales contract for the purchase of the vehicle regarding the account that is at issue in this action.

38. MECU could not refute at the time that it responded to any ACDV related to the August 1, 2023, dispute letter that it should have responded by instructing the credit reporting agency to delete the account from Plaintiff's credit file.

39. On or about August 16, 2023, Equifax responded to Mr. Aliev's dispute by allowing the MECU account to remain on the Plaintiff's credit file. Based upon information and belief, MECU responded to an ACDV issued by Equifax and did not instruct Equifax to delete the account from Mr. Aliev's credit file. This would have been a reckless and negligent ACDV reinvestigation because of the clear evidence of forgery on the loan contract. Discovery is necessary into the exact nature of the reinvestigation conducted.

40. On or about August 26, 2023, TransUnion responded to Mr. Aliev's dispute by allowing the MECU account to remain on the Plaintiff's credit file. Based upon information and belief, MECU responded to an ACDV issued by Trans Union and did not instruct Trans Union to delete the account from Mr. Aliev's credit file. This would have been a reckless and negligent ACDV reinvestigation because of the clear evidence of forgery on the loan contract. Discovery is necessary into the exact nature of the reinvestigation conducted.

41. Based upon information and belief, MECU responded to an ACDV issued by Experian in August 2023 and did not instruct Experian to delete the account from Mr. Aliev's credit file. This would have been a reckless and negligent ACDV reinvestigation because of the clear evidence of forgery on the loan contract. Discovery is necessary into the exact nature of the reinvestigation conducted.

42. On or about September 28, 2023, Plaintiff sent another set of credit dispute letters to the credit reporting agencies: Equifax, Experian, and TransUnion. Based upon information and belief, each of the credit reporting agencies received the credit dispute letter and communicated an ACDV to MECU with a copy of the credit dispute letter attached to the ACDV.

43. The credit dispute letter included a copy of the section of the forged retail installment sales contact and the back side of the Plaintiff's driver's license that had a copy of the Plaintiff's actual signature. The letter requested that MECU compare all the signatures on the paperwork and remove the account related to the forgery from his credit report.

44. On October 25, 2023, Experian issued the results of the reinvestigation of the September 28, 2023, dispute and continued to report the MECU account on the Plaintiff's credit file. Based upon information and belief, MECU responded to an ACDV issued by Experian in and did not instruct Experian to delete the account from Mr. Aliev's credit file. This would have been a reckless and negligent ACDV reinvestigation because of the clear evidence of forgery on the loan contract. Discovery is necessary into the exact nature of the reinvestigation conducted.

45. On October 27, 2023, TransUnion issued the results of the reinvestigation of the September 28, 2023, dispute and continued to report the MECU account on the Plaintiff's credit file. Based upon information and belief, MECU responded to an ACDV issued by Trans Union and did not instruct Trans Union to delete the account from Mr. Aliev's credit file. This would have been a reckless and negligent ACDV reinvestigation because of the clear evidence of forgery on the loan contract. Discovery is necessary into the exact nature of the reinvestigation conducted.

**COUNT I**
**Fair Credit Reporting Act**
**15 U.S.C. 1681 s-2(b)**

46. Plaintiff incorporates paragraphs one (1) through forty-five (45) as if fully stated herein.

47. MECU both negligently and intentionally violated the Fair Credit Reporting Act at 15 U.S.C. §1681s-2(b) by failing to conduct reasonable or thorough investigations with respect to the disputes that it received as part of the at least thirteen different ACDVs that have been previously identified in the facts.

48. Pursuant to 15 U.S.C. §1681s-2(b), a furnisher has mandatory investigation requirements after it receives an ACDV from a consumer reporting agency. After receiving the ACDV a furnisher must:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report the results to all other credit reporting agencies to which the person furnished the information; and

(E) If an item of information disputed by a consumer is found to be inaccurate or incomplete, or cannot be verified after any reinvestigation required pursuant to the statute, modify, delete, or permanently block the reporting of that information. *See* 15 U.S.C. § 1681s-2(b)(1).

49. The FCRA authorizes punitive damages for willful violations of the statutory duties identified in the statute. The clear instruction and long-standing precedent of cases analyzing 15 U.S.C. §1681s-2(b) hold that a reasonable furnisher investigation under the FCRA requires a systemic inquiry and not just a cursory examination of computer records as occurred in all of the "investigations" in this case. *See Johnson v. MBNA, Inc.* 357 F.3d 426, 430-431 (4th Cir. 2004) *stating* "Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors. Further, § 1681s-2(b)(1)(A) uses the term 'investigation' in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute - and, ultimately, correct

- inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, *unreasonable* inquiries by creditors."

50. Courts have held that reasonable investigations may require more than just a review of internal documentation. This is especially true when among the allegations is that the documents relating to the underlying transaction are flawed. "A jury could therefore find it was unreasonable for Chase to not expand its investigation beyond its own internal records." *See Petras v. Navy Federal Credit Union*, 2:20-cv-00874, United States District Court of Nevada, Document 98, page 10 of 13 filed 2/22/22.

51. Given the facts of this matter, MECU disregarded even a cursory review of its own records let alone the detailed systematic approach required for proper FCRA investigations with consultation of available information outside of its own records. If MECU had taken any time to examine its own documents and records, it would have seen all the glaring red flags that would have prevented any verification. In all likelihood, MECU implements this policy to keep the cost of credit dispute investigations low with no regard to the great harm that it causes consumers.

52. Based upon information and belief, MECU did not want to acknowledge the fraud and forgery from this transaction and loan since that would have triggered its obligation to refund about $70,000 in fraudulent insurance proceeds.

53. As described in the factual averments, MECU would have received multiple ACDVs from the three major credit reporting agencies that detailed the nature of the fraud and forgery. Only negligent and reckless investigations would ignore the documents provided, examples of the signatures, and a description of the fraudulent nature of the transaction and thereafter not instruct the credit reporting agencies to delete the account

from the Plaintiff's credit report. Each of the processors that verified that this account belonged to Mr. Aliev either recklessly processed the dispute investigation or knew that this was not his account and intentionally verified information to the CRAs that he/she knew was inaccurate.

54.    These reckless investigations allowed the inaccurate MECU trade line data to remain on Mr. Aliev's credit report and MECU to retain the fraudulent insurance proceeds. As a result, his credit score and ability to obtain credit was severely damaged by the defaulted account. This adverse trade line impacted his ability to obtain credit or have access to his credit. Mr. Aliev suffered frustration and distress from this trade line and his inability to get MECU to correct it. The repeated verifications from MECU forced Mr. Aliev to continue to draft dispute letters to the CRAs and await the results of the reinvestigation letters, which caused a loss of time.

55.    Extensive punitive damages are warranted by the facts of this matter because MECU has ignored the clear instruction and long-standing precedent of the requirements of a reasonable furnisher investigation under the FCRA based upon the obvious nature of the forgery. MECU and its dispute processors could see from the body of the dispute letters that the CRAs forwarded to it that the signature of Mr. Aliev as evidenced on his driver's license and his dispute letter matched, but the ones on the loan documents did not look at all similar.

56.    Any review or examination of the documentation that it received from ADF related to the identity of the purchaser would have revealed that it was not normal and highly suspect. Lenders like MECU receive photocopies of consumer documentation like

a driver's license, not photographs of a driver's license that were obviously not take at the dealership since the photograph reveals a bare foot.

57. Either the MECU dispute investigators did not take the time to review its own documents, or they did examine the documents and discovered that the driver's license photograph was highly unusual, had a different address than the loan documents and the signatures were completely different.

58. Plaintiff is entitled to actual damages, statutory damages, and punitive damages based upon the violations of the Fair Credit Reporting Act. Plaintiff suffered damages in the form of the loss of time working to correct the reporting of the inaccurate accounts, inability to obtain a credit card, loss of access to credit, inconvenience, and frustration and aggravation of dealing with problems related to the MECU account as well as all attorney's fees and costs.

### **Prayer for Relief**

Wherefore, the plaintiff prays that the Court award the following relief:

a) compensatory damages against MECU;

b) punitive damages based upon MECU's repeated violations of the FCRA and reckless disregard of all the facts that made exceedingly clear that it could not verify that Mr. Aliev had anything to do with this loan/purchase;

c) statutory damages against MECU based upon multiple violations of the FCRA;

d) interest, pre-judgment interest, costs and reasonable attorneys' fees;

e) all other further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury as to all issues against all defendants.

                                    Respectfully submitted,
                                    AGALAR ALIEV
                                    By: Counsel

                                    */s/ A. Hugo Blankingship, III*
                                    A. Hugo Blankingship, III
                                    Blankingship & Christiano, P.C.
                                    11862 Sunrise Valley Dr., Suite 201
                                    Reston, Virginia 20191
                                    hugo@blankingship.com
                                    (571) 313-0412
                                    Fax:(571) 313-0582